2010 ND 236

**CAVENDISH FARMS, INC., Plaintiff, Appellant and Cross–Appellee**

v.

**MATHIASON FARMS, INC., Defendant, Appellee and Cross–Appellant.**

Cavendish Farms, Inc., Plaintiff, Appellant and Cross–Appellee

v.

Valley View Farms, Defendant, Appellee and Cross–Appellant.

Nos. 20090380, 20100123.

Supreme Court of North Dakota.

Dec. 14, 2010.

Rehearing Denied Jan. 18, 2011.

502

Michael J. Keaton (argued), Keaton & Associates, P.C., Palatine, IL, and Joseph F. Larson, II (on brief), Jamestown, N.D., for plaintiff, appellant and cross-appellee.

Michael Stuart Raum (argued), Fargo, N.D., and Christopher Eric Rausch (on brief), Bismarck, N.D., for defendant, appellee and cross-appellant.

CROTHERS, Justice.

[¶ 1] Cavendish Farms, Inc., appealed from district court judgments finding that it had breached contracts for the purchase of potatoes from Mathiason Farms, Inc. and Valley View Farms, Inc. ("the Growers"), and that the Growers had also breached the contracts. The Growers cross-appealed from the judgments. We affirm.

I

[¶ 2] Cavendish owns a potato processing facility, and the Growers grow potatoes. In 2005, Cavendish and the Growers entered into contracts whereby each of the Growers agreed to grow 25,000 hundredweight of russet burbank potatoes on certain designated fields and sell them to Cavendish. Cavendish agreed to buy the potatoes. The contracts specified they were for "crop year 2005," and Cavendish agreed to pay a base price of $4.70 per hundredweight for "usable potatoes." The Growers could not sell potatoes grown on the designated fields to another buyer unless Cavendish first rejected or released them.

[¶ 3] In November 2005, Cavendish made advance payments to the Growers ($36,400 to Valley View and $32,032 to Mathiason) as required by the contracts. It thereafter became apparent that there were problems with the quality of the potatoes, and the Growers attempted to recondition the potatoes by warming the piles. Cavendish refused to make the next scheduled advance payments due on February 15, 2006. Cavendish inspected two loads of potatoes in late February 2006 and determined that the potatoes were not acceptable. On March 31, 2006, Cavendish e-mailed the Growers that it was rejecting the potatoes and sent a formal letter of rejection on April 3, 2006. By that time the potatoes had deteriorated and were unmarketable.

[¶ 4] Cavendish asked the Growers to return the November advance payments, but the Growers refused. Cavendish sued the Growers, alleging they had breached the contract by failing to deliver potatoes as promised, and sought damages and return of the advance payments. The Growers answered and counterclaimed, alleging Cavendish had supplied defective seed potatoes for the 2004 crop year;[1] Cavendish had breached the 2004 contracts by failing to pay the contract price; Cavendish had breached the 2005 contracts; Cavendish had breached an implied covenant of good faith and fair dealing in the 2005 contracts; and Cavendish had engaged in unfair trade practices under the 2005 contracts. On cross-motions for summary judgment, the district court dismissed the Growers' claims for breach of an implied covenant of good faith and fair dealing and unfair trade practices. The remaining claims and counterclaims went to trial. The district court found that Cavendish owed damages for underpayments on the 2004 contracts, that Cavendish had acted in bad faith and breached the 2005 contracts by delaying its rejection of the 2005 crop of potatoes, thereby precluding the Growers from selling the potatoes to another buyer before they totally deteriorated and resulting in damages of $50,000 for each of the Growers, and that the Growers had breached the 2005 contracts by failing to provide usable potatoes and

---

1. The parties had also contracted for the sale of potatoes in 2004. The disputes arising from the 2004 contracts are not before this Court on appeal.

were required to return the advance payments made by Cavendish.

## II

### A

[¶ 5] At oral argument, Cavendish argued for the first time that the 2005 contracts were not contracts for the sale of goods and that the Uniform Commercial Code provisions codified in N.D.C.C. tit. 41 did not apply. We generally do not consider issues raised for the first time at oral argument on appeal, *see, e.g., State v. Schmitt*, 2001 ND 57, ¶ 11 n. 2, 623 N.W.2d 409. We also note that a contract to purchase a future crop is a contract for the sale of goods governed by N.D.C.C. tit. 41, even if the crop has not yet been planted. *See Red River Commodities, Inc. v. Eidsness*, 459 N.W.2d 811, 814 (N.D.1990); *Red River Commodities, Inc. v. Eidsness*, 459 N.W.2d 805, 807 (N.D.1990). Other authorities are in accord, explicitly recognizing that a contract for the sale of a future crop is a contract for the sale of goods under the Uniform Commercial Code, even if the crop has not yet been planted. *See, e.g., Seminole Peanut Co. v. Goodson*, 176 Ga.App. 42, 335 S.E.2d 157, 159 (1985); 2 Lary Lawrence, *Anderson on the Uniform Commercial Code* § 2–105:48 (3d ed.2004); 21A Am.Jur.2d *Crops* § 48 (2008); 67 Am. Jur.2d *Sales* § 58 (2003); 77A C.J.S. *Sales* § 4 (2008). The contracts in this case expressly provided that they were for "crop year 2005" and that "Cavendish Farms agrees to buy potatoes from Grower" and "Grower agrees to grow and sell potatoes to Cavendish Farms." These were contracts for the sale of goods governed by the Uniform Commercial Code as codified in N.D.C.C. tit. 41.

### B

[¶ 6] Cavendish contends the district court "secretly revived" the good-faith count of the Growers' counterclaim after expressly dismissing that count months earlier by summary judgment. In their answer and counterclaim, the Growers raised several separate claims for relief. Count 5 alleged Cavendish had breached the 2005 contracts; Count 6 alleged breach of an implied covenant of good faith and fair dealing. On Cavendish's motion for summary judgment, the district court dismissed Count 6 of the counterclaim, but Count 5 was left for trial. After trial, the district court concluded Cavendish had failed to act in good faith and had breached the 2005 contracts when it failed to reject the Growers' potatoes until late March, after they had totally deteriorated and were unmarketable.

[¶ 7] Cavendish contends the district court's summary judgment ruling completely removed the issue of good faith from the case. To support its argument, Cavendish relies upon cases acknowledging that a tort-based remedy for breach of an implied covenant of good faith and fair dealing has only been applied in this state to insurance contracts, not general commercial contracts. *See, e.g., Dalan v. Paracelsus Healthcare Corp.*, 2002 ND 46, ¶ 11, 640 N.W.2d 726.

[¶ 8] In addition to the implied covenant of good faith and fair dealing which has been recognized in insurance contracts in this state, the Uniform Commercial Code, as codified in N.D.C.C. tit. 41, expressly imposes an obligation of good faith in the performance of contractual terms:

> "Every contract or duty within this title imposes an obligation of good faith in its performance and enforcement. This section does not support an independent claim for relief for failure to perform or enforce in good faith and does not create a separate duty of fairness and reasonableness which can be independently breached."

N.D.C.C. § 41–01–18.[2] This provision, while not authorizing a separate, independent claim for relief for breach of the duty of good faith, "means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract." N.D.C.C. § 41–01–18 cmt. 1. The interplay between lack of good faith and breach of contract has been explained:

"As far as the UCC is concerned, there is no action that can be brought merely for breach of the covenant of good faith and fair dealing. In consequence, the UCC does not permit recovery of money damages for not acting in good faith where no other basis of recovery is present.

"The only action that can be brought is an action for a breach of a contract term. It is here that the concept of good faith comes into play to the extent that it gives scope or definition to a duty imposed by the contract or protects, by its implication, that neither party take any action that would defeat the performance of the other or the purpose of the contract."

1A Lary Lawrence, *Anderson on the Uniform Commercial Code* § 1–304:16R (3d ed.2004) (footnotes omitted). In prior cases interpreting good faith under the Uniform Commercial Code, this Court has noted that the good-faith obligation must "attach" to an existing contract or duty. *See Jerry Harmon Motors, Inc. v. First Nat'l Bank & Trust Co.*, 472 N.W.2d 748, 755 (N.D.1991); *Union State Bank v. Woell*, 434 N.W.2d 712, 716–17 (N.D.1989).

[¶ 9] The Growers had pleaded both a breach of contract claim and a separate claim for breach of the implied covenant of good faith and fair dealing. The district court's summary dismissal of Count 6 merely disposed of good faith as the basis for an independent claim, whether based upon the tort remedy or the Uniform Commercial Code. The court's ruling did not, expressly or impliedly, dispose of Cavendish's alleged lack of good faith as a basis for the breach of contract claim in Count 5. The court simply dismissed Count 6 and did not purport to preclude the Growers from alleging bad faith in the performance of the terms of the contract as a basis for their breach of contract claim pleaded in Count 5.

[¶ 10] Cavendish claims it was unfair and a violation of due process for the district court to rely upon the good-faith argument after trial because it was "resurrected ... without any notice or opportunity to be heard" and "none of the parties addressed this claim in any of the post-trial briefing." The record does not support Cavendish's claim. The Growers' pre-trial and post-trial briefs addressed the issue of good faith at length, citing N.D.C.C. § 41–01–18, and expressly argued Cavendish's failure to timely reject the potatoes when it knew it would not accept them established a lack of good faith and commercial reasonableness resulting in a breach of contract. Cavendish's assertion that it did not know good faith was an issue at trial is clearly belied by the record.

[¶ 11] We conclude that the district court did not "secretly revive" a claim it had previously dismissed by summary judgment and that Cavendish's due process rights were not violated by the court's consideration of Cavendish's lack of good faith in performing the contracts as a basis for finding a breach of the contracts.

---

2. The parties and the district court throughout this litigation have applied the current version of N.D.C.C. tit. 41, which was broadly amended in 2007. *See* 2007 N.D. Sess. Laws ch. 354. We therefore will also apply the current statutory provisions.

**C**

[¶ 12] Cavendish asserts that it had a right to reject the Growers' potatoes at any time until July 31, 2006 and that its rejection of the potatoes in late March, four months before the deadline, could not constitute a breach of the contracts.

[¶ 13] The contract provision governing rejection of potatoes provided "Cavendish Farms Inc. may at any time refuse to accept 'contracted potatoes' " when the potatoes did not meet specified quality standards. Although the contracts do not specify a precise date for rejection, Cavendish points to a provision in the portion of the contracts entitled "Basis of Payment," which provides a payment schedule for potatoes delivered through July, as support for its assertion that it could accept or reject potatoes at any time up to and including July 31, 2006, without breaching the contracts. Thus, Cavendish argues that, even though it may have decided in February that the potatoes were unsuitable and it would not accept them, they could wait until July 31 to reject the potatoes without breaching the contracts.

[¶ 14] This is precisely the type of situation the good-faith obligation in N.D.C.C. § 41–01–18 was intended to address. Section 41–01–18 mandates that "[e]very contract or duty within this title imposes an obligation of good faith in its performance and enforcement." "Good faith" is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." N.D.C.C. § 41–01–09(2)(t). In this case, the contracts did not provide a specific date for the rejection of the potatoes, but accorded significant discretion to Cavendish to reject them "at any time." When one party to a contract "has the power to make a discretionary decision without defined standards," the implied covenant of good faith and fair dealing applies to protect the parties' rea-sonable expectations. *Speedway Super-America, LLC v. Tropic Enters., Inc.*, 966 So.2d 1, 3 (Fla.Dist.Ct.App.2007) (quoting *Publix Super Markets, Inc. v. Wilder Corp. of Del.*, 876 So.2d 652, 654 (Fla.Dist. Ct.App.2004)). "[U]nder an agreement that appears by word or silence to invest one party with a degree of discretion in performance sufficient to deprive another party of a substantial proportion of the agreement's value, the parties' intent to be bound by an enforceable contract raises an implied obligation of good faith to observe reasonable limits in exercising that discretion, consistent with the parties' purpose or purposes in contracting." *Centronics Corp. v. Genicom Corp.*, 132 N.H. 133, 562 A.2d 187, 193 (1989). Thus, the statutory duty to act in good faith becomes a limitation on contractual discretion:

> "A contract may give one of the parties freedom of action or discretion to act with respect to certain matters. When a contract gives a party discretion the implied covenant of good faith and fair dealing bars that party from exercising that discretion in an arbitrary or unreasonable manner."

1A Lary Lawrence, *Anderson on the Uniform Commercial Code* § 1–304:46R (3d ed.2004).

[¶ 15] In this case, the term in the parties' contracts allowing Cavendish to reject the potatoes "at any time" accorded significant discretion to Cavendish in determining when it would formally reject the Growers' potatoes and allow them to be sold to other buyers. The statutory provisions mandated that it exercise that discretion in good faith and in a commercially reasonable manner. We reject Cavendish's assertion that the terms of the contracts allowed it to withhold notice of its rejection of the potatoes until July 31, even if it had made the decision to reject all of the Growers' potatoes in February

and knew that a delay in rejecting them would result in financial harm to the Growers. When one party is given substantial discretion in its manner of performance of a duty or exercise of a right under the contract, N.D.C.C. § 41–01–18 requires that the party exercise that discretion in good faith and in a commercially reasonable manner. Although Cavendish's lack of good faith does not provide the basis for a separate, independent cause of action, its failure to perform under the contracts in good faith by failing to timely reject the potatoes after deciding it would not accept them constitutes a breach of the terms of the contracts. *See* N.D.C.C. § 41–01–18 cmts.

### D

■■■■ [¶ 16] Cavendish also challenges the district court's findings that its actions constituted bad faith and breached the contract. The determination whether a party acted in good faith is generally a question of fact. *E.g., Ballensky v. Flattum–Riemers,* 2006 ND 127, ¶ 27, 716 N.W.2d 110; 1A Lary Lawrence, *Anderson on the Uniform Commercial Code* § 1–304:11R (3d ed.2004). Similarly, the determination whether a party has breached a contract is a finding of fact. *E.g., Sanders v. Gravel Prods., Inc.,* 2008 ND 161, ¶ 7, 755 N.W.2d 826. The district court made extensive findings detailing Cavendish's conduct and its effect on the Growers:

> "84. Valley View and Mathiason claim they could have marketed their potatoes for purposes other than French fry production to another processor if Cavendish would have timely rejected the potatoes. The growers claim this failure to reject the potatoes is a breach of contract, and that they are entitled to damages from Cavendish.

> "85. At Section V of the contract Cavendish can elect to reject the potatoes if they do not meet the quality specifications as provided in the contract. The contract does not specifically address the obligations of the parties if the potatoes are rejected.

> "86. However, both Cavendish witness [sic] and witnesses for the growers testified that the potatoes have value for other purposes if they are not suitable for French fry production.

> "87. While the Court has found that Valley View and Mathiason breached the contract by not providing the contracted potatoes, Cavendish still had an obligation under the contract to the growers because of that other value. Section XI, paragraph 4 of the contracts required the parties to cooperate fully to carry out the terms and intent of the contract. Also, N.D.C.C. § 41–01–18 imposes an obligation of good faith in performance and enforcement of contracts.

> "88. The same evidence that Cavendish did not act without unreasonable delay in purchasing the Hutterian potatoes supports a conclusion that it did not act in good faith in delaying the rejection of the growers' potatoes.

> "89. Cavendish knew for certain no later than the load taken and sampled on February 28, 2006, that it would not take these potatoes. Urquhart [Cavendish's employee] referred to the load as 'disastrous', and he 'made the decision that, you know what, we're fighting a losing battle here and we're not able to take these potatoes.' Even with this conclusion he still did not reject the potatoes until his email to Moe on March 31, followed by his formal letter of rejection dated April 3.

> "90. Good faith in a contract is defined as 'honesty in fact and the observance of

reasonable commercial standards of fair dealing.' N.D.C.C. § 41–01–09(2)(t).

"91. Urquhart was aware of the consequences to the growers if potatoes are rejected for processing. He testified that he realizes 'the financial hardship these growers have when their potatoes are rejected.' He was also aware that the potatoes still had value if rejected. Urquhart acknowledged that Valley View and Mathiason could not market the potatoes to another processor until he released them from the contracts, that he was aware that the soft rot was getting worse in storage, and that the possibility of the potatoes being sold to another processor was getting worse every day.

"92. Urquhart was aware that the potatoes, in the condition they were in when he knew Cavendish would not be taking them, still had value to the growers. He testified, 'when you dump potatoes on the market at this quality, you know, as opposed to getting the four seventy he would have gotten from us, he may have gotten $2.00 at a flake factory or something.'

"93. Cavendish was aware of the financial hardship to the growers if the potatoes were rejected, and was aware that some financial hardship could be avoided by marketing the potatoes elsewhere if rejected.

"94. Reasonable commercial standards of fair dealing required Cavendish to release the potatoes when it knew it would not take the potatoes while that other market was available."

The court ultimately concluded that Cavendish "did not act in good faith in the performance of the contract."

[¶ 17] Findings of fact will not be disturbed on appeal unless they are clearly erroneous. *Marsden v. Koop*, 2010 ND 196, ¶ 8, 789 N.W.2d 531. "A finding of fact is clearly erroneous only if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, after review of the entire record, we are left with a definite and firm conviction a mistake has been made." *Helfenstein v. Schutt*, 2007 ND 106, ¶ 14, 735 N.W.2d 410 (quoting *Wilson v. Ibarra*, 2006 ND 151, ¶ 9, 718 N.W.2d 568). The district court's findings of fact are supported by the record and are not clearly erroneous.

E

[¶ 18] We conclude the district court did not err in finding Cavendish breached the 2005 contracts.

III

[¶ 19] Cavendish contends the district court's award of damages was based upon mere speculation and was contrary to the evidence presented.

[¶ 20] We have outlined our standards for reviewing a district court's determination of damages for a breach of contract:

"A trial court's determination of the amount of damages caused by a breach of contract is a finding of fact subject to the clearly erroneous standard of review. 'We do not reverse the trial court's factual findings merely because we may view the evidence differently, and a choice between two permissible views of the weight of the evidence is not clearly erroneous.' *Krank v. Krank*, 2003 ND 146, ¶ 6, 669 N.W.2d 105. 'In reviewing findings of fact, we give due regard to the trial court's opportunity to assess the credibility and observe the demeanor of the witnesses.' *Wagner v. Wagner*, 2000 ND 132, ¶ 12, 612 N.W.2d 555. We view the evidence in the light most favorable to the findings, and we do not reweigh evidence or reassess

credibility if there is evidence to support the trial court's findings."

*Keller v. Bolding,* 2004 ND 80, ¶ 22, 678 N.W.2d 578 (citations omitted). "We will sustain an award of damages when it is within the range of evidence presented." *Westby v. Schmidt,* 2010 ND 44, ¶ 18, 779 N.W.2d 681.

[¶ 21] Two witnesses testified regarding the value of the Growers' potatoes in late February, when Cavendish knew it would not accept the potatoes but failed to release them for sale to other buyers. Mark Urquhart, the raw procurement manager of Cavendish's Jamestown processing plant, testified he had many years of experience in the potato industry, including knowledge of raw potato quality standards and negotiation of grower agreements. He had personally inspected the Growers' potatoes and was familiar with their condition in February 2006. He testified that potatoes "at this quality" may have been worth $2 per hundredweight at a flake factory. Robert Moe, the owner and operator of Valley View Farms, testified that the Growers had 50,000 hundredweight of potatoes in storage on March 1, 2006 and that they were worth $3 per hundredweight. The district court found the Growers had suffered damages of $2 per hundredweight caused by Cavendish's failure to timely reject the potatoes, resulting in damages of $50,000 for each of the Growers.

[¶ 22] Cavendish does not challenge the competency of Urquhart or Moe to testify as to the value of the potatoes. The district court heard the testimony and assessed the credibility of the witnesses. The amount of damages awarded, calculated at $2 per hundredweight for 50,000 hundredweight of potatoes, lies within the range of the evidence presented at trial through the testimony of competent witnesses. We conclude the district court's findings of fact on damages are not clearly erroneous.

## IV

[¶ 23] On their cross-appeal, the Growers contend the district court erred in finding that they breached the contracts and that Cavendish was entitled to recover the advance payments it made in November 2005.

## A

[¶ 24] The Growers contend that, even though they admittedly did not provide usable potatoes as required by the contracts, their performance was excused by a contract provision requiring Cavendish to accept less than the full contracted amount. That provision states:

> "Cavendish Farms Inc. will accept less than the full 'contracted cwt.' When growing conditions or storage cause substantial loss of the crop; provided, Cavendish Farms Inc. is satisfied that Grower exhausted all reasonable alternative means to meet its obligations in full. Cavendish Farms Inc. rejection of 'contracted potatoes' does not excuse grower from fulfilling this agreement in full with potatoes, which are acceptable to Cavendish Farms Inc."

[¶ 25] The Growers have construed this provision much too broadly. It merely requires Cavendish to take acceptable potatoes from the contracted fields even if the Growers cannot provide the full 25,000 hundredweight each from those fields. In effect, it prevents Cavendish from treating the contract as "all or nothing" and refusing to accept *any* of the Growers' potatoes unless they can provide the full contracted amount. This provision does not excuse the Growers' failure to fully perform the contract or prevent Cavendish from seeking damages for breach if the Growers fail to provide the contracted amount of usable

potatoes. The final sentence of this provision clarifies that the Growers are not excused "from fulfilling this agreement in full" with acceptable potatoes if Cavendish rejects some of the "contracted potatoes."

[¶ 26] The district court did not err in finding that the Growers breached the 2005 contracts by failing to provide any usable potatoes.

## B

[¶ 27] The Growers contend that, even if they did breach the contracts by failing to provide usable potatoes, Cavendish was not entitled to recover its advance payments.

[¶ 28] The Growers argue that "there is no provision in the 2005 contract providing *any* basis for the return of the advance payments, under any circumstances whatsoever." The contracts provide, however, that the advance payments are a prepayment of part of the purchase price of the potatoes and are to be factored in when calculating the final balance due when all potatoes have been delivered and accepted. The Growers are clearly required to grow and deliver potatoes meeting the contract specifications before they are entitled to retain any part of the purchase price, including the advance payments. The Growers have not posited any persuasive legal argument supporting their claim that they are entitled to retain a portion of the purchase price despite their failure to provide any usable potatoes under the contract.

[¶ 29] The Growers also contend they are entitled to recover their contractual storage costs for the potatoes, and those amounts offset the amount of the November advance payments. The contract does include provisions requiring payment of storage costs to the Growers. Those costs, however, are to be paid based upon the date potatoes are "accepted into the processing plant" and are "de-termined by the usable weight delivered." The contract clearly conditions Cavendish's obligation to pay storage costs upon the potatoes ultimately being accepted and "usable" under the contract. The Growers did not provide "acceptable" or "usable" potatoes meeting the quality standards under the contract, and Cavendish therefore did not owe storage costs for the unacceptable potatoes.

## C

[¶ 30] The district court did not err in determining that the Growers breached the 2005 contracts and that Cavendish was entitled to recover its advance payments made to the Growers.

## V

[¶ 31] We have considered the remaining issues and arguments raised by the parties and find them to be either unnecessary to our decision or without merit. The judgments are affirmed.

GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, J., RICHARD L. HAGAR and DONOVAN JOHN FOUGHTY, D.JJ., concur.

[¶ 32] The Honorable DONOVAN JOHN FOUGHTY, D.J., and RICHARD L. HAGAR, D.J., sitting in place of SANDSTROM, J., and KAPSNER, J., disqualified.