2011 ND 168

**Gerald F. CARLSON, Plaintiff, Appellant and Cross–Appellee**

v.

**Marlys Jane CARLSON, Defendant and Appellee**

and

**Mylee Redlin, Defendant, Appellee and Cross–Appellant**

Gerald F. Carlson, Plaintiff, Appellant and Cross–Appellee

v.

**Limited Partnership of Carlson Hereford Farm/Ranch, Defendant**

and

**Mylee Redlin, Defendant, Appellee and Cross–Appellant.**

Nos. 20100318, 20100319.

Supreme Court of North Dakota.

Aug. 22, 2011.

Rehearing Denied Sept. 19, 2011.

Kip M. Kaler (argued), Fargo, N.D., for plaintiff, appellant and cross-appellee.

Kenneth L. Dalsted (on brief), Jamestown, N.D., for defendant and appellee Marlys Jane Carlson.

Monte Lane Rogneby (argued) and Mandy R. Maxon (appeared), Bismarck, N.D., for defendant, appellee and cross-appellant Mylee Redlin.

CROTHERS, Justice.

[¶ 1] Gerald Carlson appeals, and Gary Carlson cross-appeals, from a district court judgment dissolving their farming and ranching partnership and settling their capital accounts in the partnership. We affirm in part, vacate in part, and reverse and remand in part, concluding: (1) the district court's finding the partners agreed there would be no accounting for unequal contributions of proceeds from the sale of individually owned land to pay partnership debt was not clearly erroneous; (2) the district court's findings Gerald Carlson was not entitled to reimbursement for amounts charged to his personal credit cards were inconsistent and did not enable this Court to understand the rationale for the result reached; (3) the district court erred in determining Gary Carlson's transfer of an interest in land to his wife violated the Uniform Fraudulent Transfer Act; and (4) the district court erred in concluding Gerald Carlson was not liable for breach of fiduciary duty for failing to pay Gary Carlson's life insurance premiums.

I

[¶ 2] The Carlsons are brothers who participated in a farming and ranching partnership in Stutsman County from 1971 to 2007. All land used in the partnership business was titled individually in the partner's name. Each partner also built a home on his respective property. Although titled in the partners' names, all costs and expenses for the individually held real estate, including mortgage payments, insurance and taxes, were paid by the partnership. The amount of property owned by the partners and the payments made on behalf of the property by the partnership were not equal. The district court found that "[f]rom the beginning the overriding purpose of the partnership was to pay the real estate mortgage payments of the individual partners to the end that the partners would own their land and homes individually without bank mortgages."

[¶ 3] In addition to the payment of costs related to the land, until 2003 the partnership paid the personal and house-

hold expenses of the partners and their families, including personal travel, household furnishings, medical bills, chiropractic bills, clothing and the partners' children's college tuition and expenses. The partners maintained credit cards in their individual names, routinely using the credit cards to pay for both partnership and personal expenses, and the partnership paid the credit card billings. The district court found that "both partners were agreeable that the partnership would pay for whatever the partners' families needed." When the partnership experienced financial difficulties in 2003, the partnership limited payment of the partners' personal expenses to mortgage payments, real estate taxes, utilities, life insurance premiums, vehicle payments, and property and vehicle insurance premiums.

[¶ 4] In the 1990s, the partners found it necessary to sell some of their individually owned real estate to pay down the partnership's outstanding debt. Gerald Carlson sold three parcels of land and Gary Carlson sold one, with most of the proceeds applied to the partnership debt. Gerald Carlson claims that the value of the proceeds from his land applied to the partnership debt was greater than that of his brother's.

[¶ 5] In 2003 the partnership's lender required that in order for the partnership to secure an operating loan, both partners would have to convey certain land to the lender, with the deeds to be held in escrow until the partnership debts were paid. Gerald Carlson conveyed 300 acres to the lender, but his 90–acre homestead was not included; Gary Carlson conveyed 600 acres, including his homestead, to the lender. When the partnership debt was not repaid, the lender recorded the deeds in 2004. Gary Carlson's wife, Marlys Carlson, used her retirement funds to repurchase 530 acres of his land from the lend-

er, and the lender issued a quit claim deed to Gary and Marlys Carlson. Claiming the deed was in error and it was their intent that Marlys Carlson would receive the property in her name only, Gary Carlson subsequently conveyed his interest in the property to her.

[¶ 6] In 2002, the partners took out four insurance policies on the lives of Gerald Carlson and Gary Carlson, one business policy and one personal policy on each, with policy premiums paid by the partnership. The partners allowed the business policies to lapse in 2004, but continued the personal policies. In 2005, while Gerald Carlson was acting as managing partner and handling payment of the partnership's bills, he stopped making payments on Gary Carlson's policy but continued making payments from partnership funds on his own policy. Gary Carlson's policy lapsed and was terminated for nonpayment of premiums in 2005.

[¶ 7] In 2007 Gerald Carlson sued Gary Carlson and the partnership, seeking dissolution of the partnership and a determination of the amount of each partner's capital account. Gerald Carlson claimed the partners' capital accounts should be credited with the value of the land each sold to pay partnership debts. He also claimed he was entitled to credit for amounts he paid on his personal credit cards that should have been paid by the partnership. He also brought a separate action against Gary and Marlys Carlson, alleging Gary Carlson's transfer of his interest in the real estate to Marlys Carlson was a fraudulent transfer violating N.D.C.C. ch. 13–02.1. Gary and Marlys Carlson counterclaimed, seeking an accounting and alleging Gerald Carlson breached his fiduciary duty by failing to pay Gary Carlson's life insurance premiums. The cases were consolidated for trial.

[¶ 8]  The district court found the partners had agreed to make unequal contributions to, and to receive unequal benefits from, the partnership, without an accounting for the unequal contributions and benefits:

"[I]t was the explicit or implicit agreement of the partners throughout the existence of this partnership that the contributions that each partner made in the form of expertise, labor, or contributions from the income or product from their respective real estate holdings would not be equal.  Similarly, it was also the agreement that the partnership pay expenses on behalf of the partners and their families without any regard as to whether the expenses were clearly personal or whether the expenses related in any manner to the business of the partnership, and that the amounts paid to the partners for these expenses would not be equal.

. . . .

The sales of real estate to pay partnership debt and the transfers of real estate to the lender in partial satisfaction of debt were made, as were all other partnership transactions, with the knowledge that they would not be equal, and with the intent that there would be no accounting for unequal contributions.  Neither partner is entitled to a reimbursement from the partnership for the contributions in the form of the real estate transactions for that reason."

The court also determined Gerald Carlson was not entitled to reimbursement for items charged to his personal credit cards.  The court concluded that Gary Carlson's transfer of his interest in real estate to his wife violated N.D.C.C. ch. 13–02.1, the Uniform Fraudulent Transfer Act, and that if Gerald Carlson was required in the future to pay more than his share of the partnership debt, he could avoid that

transfer.  The court also concluded Gerald Carlson was not liable for breach of fiduciary duty for failing to pay Gary Carlson's insurance premiums and allowing the policy to lapse.  Judgment was entered dissolving the partnership and determining Gary Carlson had a capital account balance of $5,387 and Gerald Carlson had a capital account balance of a negative $9,220.23.

## II

[¶ 9]  Gerald Carlson contends that the value of his individually owned land sold to pay partnership debt exceeded the value of Gary Carlson's land sold to pay partnership debt and that the district court erred in not allowing a credit to their capital accounts for the land transactions.

[¶ 10]  Gerald Carlson relies upon N.D.C.C. § 45–16–01, which was adopted from the Uniform Partnership Act, to support his assertion that a partner is entitled to reimbursement for advances to the partnership.  The relevant provisions are subsections (3), (4) and (5):

"3.  A partnership shall reimburse a partner for payments made and indemnify a partner for liabilities incurred by the partner in the ordinary course of the business of the partnership or for the preservation of its business or property.

4.  A partnership shall reimburse a partner for an advance to the partnership beyond the amount of capital the partner agreed to contribute.

5.  A payment or advance made by a partner which gives rise to a partnership obligation under subsection 3 or 4 constitutes a loan to the partnership which accrues interest from the date of the payment or advance."

N.D.C.C. § 45–16–01(3), (4) and (5).  Gerald Carlson contends these provisions cre-

ate a mandatory duty and any payments or advances made by a partner on behalf of the partnership must be credited to the partner's capital account as a loan to the partnership.

[¶ 11] He argues N.D.C.C. § 45–16–01 creates a statutory presumption, thereby invoking the burden-shifting procedures mandated by N.D.R.Ev. 301. Section 45–16–01, N.D.C.C., however, does not create a statutory presumption. Statutory presumptions are evidentiary devices. The Explanatory Note to N.D.R.Ev. 301 explains that "a presumption is not evidence, it is a legal method of dealing with evidence" and that "a presumption may be stated to be a rule of law that requires the trier of fact to draw a particular inference from a particular fact, or from particular evidence, unless and until the truth of the inference is disproved." Section 45–16–01, N.D.C.C., does not create such an evidentiary presumption, but merely supplies default provisions for a partnership agreement if the partnership agreement does not address particular issues. *See* Uniform Partnership Act § 103 cmt. 1 (N.D.C.C. § 45–13–03), and § 401 cmt. 1 (N.D.C.C. § 45–16–01).

[¶ 12] Under N.D.C.C. § 45–13–03(1), "relations among the partners and between the partners and the partnership are governed by the partnership agreement." The provisions of N.D.C.C. § 45–16–01 apply only if the partners have not otherwise provided for those matters. *See Akerlind v. Buck*, 2003 ND 169, ¶ 21, 671 N.W.2d 256; Uniform Partnership Act § 103 cmt. 1, and § 401 cmt. 1. Thus, the partners may agree to handle contributions to the partnership and benefits drawn from the partnership in a manner different than provided in the default provisions of N.D.C.C. § 45–16–01. Furthermore, such an agreement may be written, oral or implied from the conduct of the partners. *See* N.D.C.C. § 45–13–01(20); Uniform Partnership Act § 101 cmt.

[¶ 13] In this case, the court found "that it was the explicit or implicit agreement of the partners throughout the existence of this partnership that the contributions that each partner made in the form of expertise, labor, or contributions from the income or product from their respective real estate holdings would not be equal" and that "[t]he sales of real estate to pay partnership debt ... were made, as were all other partnership transactions, with the knowledge that they would not be equal, and with the intent that there would be no accounting for unequal contributions." The long history of the partners' conduct supports that finding. The record demonstrates the partners did not conduct this partnership in a usual business manner, but pooled their resources and income to fund each partner's family's expenses. The district court found the partnership paid the partners' individual personal credit card accounts, personal travel expenses, household furnishings, medical bills, chiropractic bills, clothing and the partners' children's college expenses. The partners used their individually held real estate to conduct the partnership's business and until 2003, when the partners altered their business arrangement, paid essentially all personal and household expenses of both partners' families from partnership funds without accounting for inequalities in contributions or benefits.

[¶ 14] While Gerald Carlson claims no evidence supports the district court's finding that the partners agreed there would be no accounting or credit given for unequal real estate contributions, the lengthy history of this partnership indicates a continuous pattern of unequal contributions and unequal benefits existed with absolutely no attempt to account for or equalize the differences. He conceded

in his brief on appeal that these real estate contributions were not itemized in the partnership books. This Court has held that "the failure to make annual claims or accountings for unequal contributions and benefits is indicative the partners did not intend to equalize them." *In re Estate of Thomas*, 532 N.W.2d 676, 682 (N.D.1995). In this case, there were no annual claims or accountings for the unequal real estate transactions during the lengthy history of this partnership until the partners sought dissolution of the partnership in 2007. At that point, more than a decade had passed since many of the disputed real estate transactions had occurred. Under our holding in *Thomas*, the long-term failure of either partner to make a claim or seek an accounting supports the district court's finding that the partners did not intend to account for or equalize the unequal real estate contributions.

[¶ 15] "Findings of fact will not be disturbed on appeal unless they are clearly erroneous." *Cavendish Farms, Inc. v. Mathiason Farms, Inc.*, 2010 ND 236, ¶ 17, 792 N.W.2d 500. " 'A finding of fact is clearly erroneous only if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, after review of the entire record, we are left with a definite and firm conviction a mistake has been made.' " *Id.* (quoting *Helfenstein v. Schutt*, 2007 ND 106, ¶ 14, 735 N.W.2d 410). We conclude the district court's finding that the partners had agreed there would be no accounting or equalization of unequal real estate contributions to pay partnership debt was not clearly erroneous and that N.D.C.C. § 45–16–01 did not mandate a credit for unequal contributions when the partners had agreed otherwise.

### III

[¶ 16] Gerald Carlson contends the district court erred in concluding he was not entitled to a credit on his capital account for payments or advances charged to his personal credit cards. He claims these amounts either were business expenses of the partnership or were incurred at a time when the partnership was routinely paying the partners' personal expenses charged to the credit cards.

[¶ 17] The district court declined to credit Gerald Carlson's account for these expenses, finding insufficient evidence existed to find they were business related:

"In his post-trial brief Gerald requests that he be credited with the costs of items he purchased on his personal credit cards, claiming they were 'debts incurred for the benefit of the partnership.' He lists 'fuel, fertilizer, travel expenses, etc.' For a time, the partners never intended to make a determination as to what fuel purchases or travel expenses were personal or business related, for the reason that many purchases were paid without regard to their relationship to the ordinary course of partnership business. But in regard to these items, there is no evidence that the partnership agreed to pay these expenses, or that they had ever been submitted to the partnership, and there is insufficient evidence for the Court to find that any of these expenses were business related for Gerald to be given a credit on his partnership account for these items."

[¶ 18] The district court's findings on this issue are confusing. The evidence indicates most, if not all, of the disputed charges were incurred prior to the 2003 change in the partnership's payment of personal expenses. The district court expressly found that prior to the change in 2003, the partnership paid for personal and household expenses of the partners which were billed to their personal credit cards:

"[T]he partnership paid the personal and household expenses of the partners. Over the years the partners maintained credit cards in their individual names, and used the credit cards to pay for partnership expenses and personal expenses. The partnership paid the credit card billings. The partnership paid for items that were clearly partnership expenses such as equipment purchases and utilities. The partnership also paid for items of both partners that were clearly personal and not related in any manner to partnership business.... In summary, both partners were agreeable that the partnership would pay for whatever the partners' families needed."

The court further found "it was also the agreement that the partnership pay expenses on behalf of the partners and their families without any regard as to whether the expenses were clearly personal or whether the expenses related in any manner to the business of the partnership, and that the amounts paid to the partners for these expenses would not be equal."

[¶ 19] To the extent the credit card charges were incurred prior to the 2003 change in payment of personal expenses, we do not understand the district court's finding that the partnership had not agreed to pay them when the court expressly found a broad, general agreement existed to pay the partners' personal expenses, including those charged to the credit cards. The district court's findings of fact must reflect the basis of its decision and must enable this Court to understand its reasoning. *American Bank Center v. Wiest*, 2010 ND 251, ¶ 32, 793 N.W.2d 172; *Tulintseff v. Jacobsen*, 2000 ND 147, ¶ 12, 615 N.W.2d 129. We will remand for clarification of the findings of fact when the findings are inconsistent or we are unable to discern the rationale for the result reached by the district court. *See Hagel v. Hagel*, 2006 ND 181, ¶ 14, 721 N.W.2d 1; *Tulintseff*, at ¶ 12; *Holtz v. Holtz*, 1999 ND 105, ¶ 18, 595 N.W.2d 1. Given the conflicting, inconsistent findings of fact on this issue, we are unable to discern the rationale for the result reached by the district court. We therefore reverse in part and remand for clarification of the findings of fact on this issue. The district court may take additional testimony on remand if necessary to clarify and resolve the issue.

IV

[¶ 20] On his cross-appeal, Gary Carlson contends the district court erred when it applied the Uniform Fraudulent Transfer Act, N.D.C.C. ch. 13–02.1, to the transfer of property from Gary to Marlys Carlson.

[¶ 21] The district court held the transfer was fraudulent under N.D.C.C. § 13–02.1–04(1)(b), which provides:

"A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

....

b. Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction or the debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

The district court concluded Gary Carlson had not received reasonably equivalent value in exchange for the transfer and, at the time of the transfer, he was engaged in a partnership business which was unreasonably undercapitalized.

[¶ 22] Under N.D.C.C. ch. 13–02.1, transfers may be found fraudulent "as to a creditor," N.D.C.C. § 13–02.1–04(1), and only a creditor may seek relief to avoid a transfer under the Act, N.D.C.C. § 13–02.1–07. A "creditor" is defined as "a person who has a claim." N.D.C.C. § 13–02.1–01(4). A "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." N.D.C.C. § 13–02.1–01(3). In *Jahner v. Jacob*, 515 N.W.2d 183, 185 (N.D.1994), this Court interpreted the similar definition of creditor in the Uniform Fraudulent Conveyance Act, which has been superseded by the Uniform Fraudulent Transfer Act, and concluded that "[a] valid, presently enforceable debt against the original transferor is an essential element of an action against the transferee to set aside a fraudulent transfer." The Court therefore concluded that "[w]ithout a debt enforceable against the transferor, a creditor has no claim against the transferee." *Id.* "[T]he action to set aside a fraudulent [transfer] is merely 'incidental' ... and 'ancillary' to the creditor's right to collect the underlying debt." *Id.*

[¶ 23] In this case, the district court found that "[i]f Gerald is required to pay partnership obligations greater than his share because Gary cannot pay his proportional share, Gerald then is a creditor of Gary." The court's use of the language "*[i]f* Gerald is required to pay ... Gerald *then* is a creditor" clearly indicates this is not a "presently enforceable debt." *Jah-*

*ner,* 515 N.W.2d at 185. In effect, the district court concluded that because Gary Carlson might at some future date become personally liable to pay his share of outstanding partnership debt and may at that future date fail to pay, Gerald Carlson may potentially become liable for Gary Carlson's share of the debt and will then become a creditor with a claim against him. Under the reasoning of the district court, all partners would automatically be creditors of all other partners because they might become liable at some undetermined date in the future for the other partners' share of unpaid partnership debt.

[¶ 24] Under the facts in this case, there was not "[a] valid, presently enforceable debt against the original transferor," *Jahner,* 515 N.W.2d at 185, and any declaration of the avoidability of the transfer in the event that at some future date Gerald Carlson becomes a creditor of Gary Carlson amounts to a purely advisory opinion. This Court has consistently held that "[t]he judicial power vested in the courts extends only to ... actual controversies properly before the courts, and does not authorize a court to act in an advisory capacity." *Isaacson v. Isaacson,* 2010 ND 18, ¶ 12, 777 N.W.2d 886 (quoting *Lockwood v. Baird,* 59 N.D. 713, 719, 231 N.W. 851, 853 (1930)). The district court erred in concluding Gerald Carlson was a creditor under the Act and in concluding Gerald Carlson could avoid the disputed transfer if a claim arose in the future. We therefore vacate that part of the judgment deeming the transfer of property from Gary to Marlys Carlson was fraudulent and could be avoided by Gerald Carlson.

V

[¶ 25] Gary Carlson contends the district court erred by concluding he was not entitled to damages for Gerald Carl-

son's breach of fiduciary duty for failing to pay life insurance premiums.

[¶ 26] The parties agreed to take out two separate life insurance policies, one business and one personal, on the lives of Gerald and Gary Carlson and to pay all premiums through the partnership. The partners agreed to let the business policies lapse, but continued the personal life insurance policies. In 2005, while Gerald Carlson was acting as managing partner and handling payment of partnership bills, he stopped paying premiums on Gary Carlson's policy, allowing it to lapse, while continuing payments on his own policy. The district court found Gary and Marlys Carlson received notice that the premiums were past due and that the policy was in danger of being cancelled. The court also found, however, that Gerald Carlson had told Gary Carlson the premiums were being paid:

> "Gerald's testimony on the issue of payment of Gary's insurance premiums is not credible. He testified at one point that he assumed that Gary and Marlys were making the premium payments, and testified later that he had received a projection in January, 2005, indicating how long Gary's policy would be in effect without further payment. He had told Gary after the policy had lapsed that he, Gerald, was still making the payments."

The district court nevertheless denied any recovery for breach of fiduciary duty, concluding that payment of the insurance premiums was Gary Carlson's responsibility because he was the owner of the policy, that the life insurance contract was not a partnership contract but a contract between Gary Carlson and the insurance company and that the fact the partners had expressly agreed the partnership would pay the premiums as remuneration of the individual partners did not shift from Gary Carlson to the partnership or

Gerald Carlson the responsibility to make the payments to prevent lapse.

[¶ 27] Under N.D.C.C. § 45–16–04(4), a partner is required to discharge the duties to other partners under the partnership agreement consistently with the obligation of good faith and fair dealing. This Court has therefore held that " '[t]he conduct of partners ... during any transaction connected with the ... conduct of the partnership is governed by a fiduciary duty which requires every partner to act with the utmost good faith and integrity in the dealings with one another with respect to partnership affairs.' " *Red River Wings, Inc. v. Hoot, Inc.*, 2008 ND 117, ¶ 26, 751 N.W.2d 206 (quoting *Svihl v. Gress*, 216 N.W.2d 110, 111 Syll. 1 (N.D. 1974)). The Court further concluded that "a partner has a fiduciary duty of loyalty to the partnership and other partners." *Red River Wings*, at ¶ 26; *see also Akerlind v. Buck*, 2003 ND 169, ¶ 26, 671 N.W.2d 256.

[¶ 28] Gerald Carlson, while acting as managing partner, had a fiduciary duty of utmost good faith and loyalty to Gary Carlson when conducting financial affairs of the partnership. The partnership agreement required that, as a form of remuneration to the partners, the partnership would pay their personal life insurance premiums. The fact Gary Carlson had been given notice the premiums were past due and could have paid the premiums himself did not nullify Gerald Carlson's fiduciary duty to continue making payments which the partnership agreement required him to pay. The district court concluded: "That the partners agreed the partnership would make payments as remuneration to the individual partners does not shift the responsibility to make the payments to prevent lapse from Gary to the partnership or Gerald." That is, however, *precisely* what the part-

nership agreement did—it required the partnership, as part of Gary Carlson's remuneration from the partnership, to pay his premiums, and Gerald Carlson as managing partner had a fiduciary duty of utmost good faith and loyalty to make the payments in a timely manner.

[¶ 29] The district court premised its holding on its conclusion Gary Carlson at any time could have paid the premiums and prevented the lapse, but that ignores the court's express finding that Gerald Carlson had told Gary Carlson he "was still making the payments" on Gary Carlson's policy. The fact Gary Carlson could have paid the premiums himself to prevent lapse of the policy may be relevant to a comparative fault argument, but it did not relieve Gerald Carlson of his fiduciary duty to make the payments as required by the partnership agreement. *See* N.D.C.C. ch. 32–03.2.

[¶ 30] We conclude the district court erred in determining Gerald Carlson was not liable for breach of his fiduciary duty to Gary Carlson for failing to pay the life insurance premiums while continuing to pay his own premiums with partnership funds. We reverse that part of the judgment refusing to award damages for breach of fiduciary duty and remand for further proceedings in accordance with this opinion. On remand, the district court may consider whether Gary Carlson had contributory fault connected with lapse of the policy.

## VI

[¶ 31] We have considered the remaining issues and arguments raised by the parties and find them either unnecessary to our decision or without merit. The judgment is affirmed in part, vacated in part, and reversed and remanded in part.

[¶ 32] GERALD W. VANDE WALLE, C.J., BENNY GRAFF, S.J., DANIEL J. CROTHERS, MARY MUEHLEN MARING, and DALE V. SANDSTROM, JJ., concur.

[¶ 33] The Honorable BENNY A. GRAFF, S.J., sitting in place of KAPSNER, J., disqualified.